## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

| | |
|---|---|
| **BEVERLY ANDERSON,** individually and on behalf of all others similarly situated, <br><br> Plaintiff, <br><br> v. <br><br> **CATALINA STRUCTURED FUNDING, INC.,** <br><br> Defendant. | **CASE NO: 1:21-cv-00197-PLM-SJB** <br><br> HON. PAUL L. MALONEY <br><br> **ORAL ARGUMENT REQUESTED** |

### PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S
### MOTION TO DISMISS FIRST AMENDED CLASS ACTION COMPLAINT

Plaintiff Beverly Anderson hereby responds in opposition to Defendant Catalina Structured Funding, Inc.'s Motion to Dismiss First Amended Class Action Complaint (the "Motion" or "Mot."), [DE 14], and in support states:

### I.      INTRODUCTION

Over the years, "a number of commentators, courts, and legislatures have become concerned by the growing number of companies, sometimes called 'factoring companies,' that *'purchase'* structured settlements from personal injury victims by paying the victim immediate cash for the right to future payments under the settlement." *Granati v. Stone St. Cap., Inc. (In re Granati)*, 270 B.R. 575, 588 (Bankr. E.D. Va. 2001) (quoting Leo Andrada, Note, *Structured Settlements: The Assignability Problem*, 9 S. Cal. Interdisciplinary L.J. 465, 465 (2000)) (emphasis supplied).  "While formally documented as a purchase, 'in practice, the transaction resembles a loan, where the factoring company lends money to be repaid later, plus

interest.'" *Id.* at 589. "The effective interest rate is often quite high compared to conventional loan transactions." *Id.* (citing report by the leading factoring company that its effective interest rate is about 21% per year).

Defendant is one such factoring company that "purchases" structured settlements. Defendant tracks down recipients of structured settlements and engages in aggressive telephone solicitations so that it can charge those individuals exorbitant fees that are represented as discount rates and/or interest fees, some of which approach or exceed state usury limits.  As alleged in the operative First Amended Complaint, Defendant charges consumers for the loan products and services it provides, either directly or through discounted rates.

The sole argument Defendant raises in its Motion is that it did not violate the Telephone Consumer Protection Act ("TCPA") because it was attempting to "purchase" Plaintiff's and the Class members' structured settlements and was not trying to sell them anything.  Defendant's argument ignores the allegations of Plaintiff's First Amended Complaint, common sense, and Defendant's own court filed documents.[1] In fact, at least one district court rejected this exact argument in the context of a TCPA class action.  *See Buja v. Novation Capital, Ltd. Liab. Co.*, No. 15-81002-CIV-MARRA, 2017 U.S. Dist. LEXIS 231500 (S.D. Fla. Mar. 30, 2017) (rejecting argument by a structured-settlement defendant that it was not engaged in telephone solicitations because it "purchases" settlements).

As alleged in Plaintiff's First Amended Complaint, Defendant sells various services associated with the consummation of structured-settlement transactions. Defendant does not provide these services for free; it charges consumers high fees that are reflected as discounted rates

---

[1] Plaintiff agrees with Defendant that this Court may take judicial notice of court filings in cases involving Defendant and hereby requests that the Court take judicial notice of the court filings attached to Plaintiff's Request for Judicial Notice ("RJN"), [DE 21-1], Exhibits 1 – 7.

and/or interest fees.  Defendant accuses Plaintiff's arguments of being "illogical" and attempts to conceal its practices by cherry-picking and presenting to this Court nearly 300 pages of court filings that simply confirm the unsurprising fact that Defendant is required to obtain court approval before it convinces consumers to hand over their structured settlements.  The reason Defendant is required to seek such court approval is "[b]ecause the underlying purpose of a structured settlement is not only to compensate an injured party but also to protect the party from his or her own improvidence[.]"  *Granati v. Stone St. Cap., Inc. (In re Granati)*, 270 B.R. at 578; *see also Allstate Settlement Corp. v. Rapid Settlements, Ltd.*, 559 F.3d 164, 165 (3d Cir. 2009) ("Because of abusive practices employed by some factoring companies, at least forty-three state legislatures have enacted statutes requiring court approval of a transfer of future structured settlement payments.").

In Michigan, Defendant is not required to disclose to consumer the effective interest rate that they are paying Defendant for its services.  However, in other jurisdictions, for example California (where Defendant is headquartered) and Florida, Defendant must disclose to consumers that they are paying Defendant for its services in the form high interest rate charges.  The following are just a few examples from cases involving Defendant:

1. *In Re: Justin Brown and Catalina Structured Funding, Inc.*: "YOU WILL BE PAYING THE EQUIVALENT OF AN INTEREST RATE OF 16.252% PER YEAR."[2]

2. *In Re: Olubajo Brooks and Catalina Structured Funding, Inc.*: "YOU WILL BE PAYING THE EQUIVALENT OF AN INTEREST RATE OF 10.268% PER YEAR."[3]

3. *In Re: David Dallas and Catalina Structured Funding, Inc.*: "Based on the new amount that you will receive from us and the amounts and timing of the structured settlement payments that you are

---

[2] *See* RJN, Ex. 1 at Bates 020.

[3] *Id.*, Ex. 2 at Bates 051.

turning over to us, you will, in effect, be paying interest to us at a rate of <u>22.25%</u> per year."[4]

4.  *In Re: Marcus Taylor and Catalina Structured Funding, Inc.*: "Based on the new amount that you will receive from us and the amounts and timing of the structured settlement payments that you are turning over to us, you will, in effect, be paying interest to us at a rate of <u>19.157%</u> per year."[5]

5.  *In Re: Michael Miller and Catalina Structured Funding, Inc.*: "Based on the new amount that you will receive from us and the amounts and timing of the structured settlement payments that you are turning over to us, you will, in effect, be paying interest to us at a rate of <u>18.062%</u> per year."[6]

6.  *In Re: Ronald Ralph and Catalina Structured Funding, Inc.*: "Based on the new amount that you will receive from us and the amounts and timing of the structured settlement payments that you are turning over to us, you will, in effect, be paying interest to us at a rate of <u>30.70%</u> per year."[7]

7.  *In Re: Tralanna Cauley and Catalina Structured Funding, Inc.*: "Based on the new amount that you will receive from us and the amounts and timing of the structured settlement payments that you are turning over to us, you will, in effect, be paying interest to us at a rate of <u>13.701%</u> per year."[8]

In sum, Defendant is lender and sells loan products and related services.  It harasses consumers with telephone solicitations – even after repeated opt-out requests – because it is attempting to encourage consumers to purchase and invest in its services and loan products. Defendant has failed to overcome Plaintiff's well-pleaded allegations.  If this Court has any doubt,

---

[4] *Id.*, Ex. 3 at Bates 083-084.

[5] *Id.*, Ex. 4 at Bates 110-111.

[6] *Id.*, Ex. 5 at Bates 138.

[7] *Id.*, Ex. 6 at Bates 165.

[8] *Id.*, Ex. 7 at Bates 188-189.

it should rule on the issue on a developed factual record, not based on self-serving arguments and narrative.

## II.   <u>FACTS</u>

Defendant purchases structured settlements and annuities from individuals. First Amended Complaint, [DE 12], at ¶ 12. A structured settlement is a legal settlement which provides in whole or in part for periodic payments. *Id.* at ¶ 13. Pursuant to the structured settlement, the annuitant must receive their money in payments over time. *Id.* at ¶ 13. As a purchaser of structured settlements, Defendant offers consumers the option to obtain their money in a lump-sum—at a discount—rather than over a period of time. *Id.* at ¶ 14.

Defendant generates revenue by purchasing the structured settlements at a discounted rate and by charging consumers various transactional fees including legal fees, court fees, broker commission, insurance company payments, administrative fees and/or processing fees. *Id.* at ¶ 15. Defendant's profit and transactional fees are reflected as an "effective discount rate". *Id.* at ¶ 15. Typical effective discount rates may range anywhere from 10% to 30%. *Id.* at ¶ 15. Defendant's services are not free, and it regularly charges consumers fees to perform a number of services, including: (i) processing the payee's application; (ii) computing the present value of the structured settlement; (iii) complying with underwriting requirements; (iv) preparing and processing the contract; (v) complying with applicable disclosure laws and other laws pertaining to court approval; and (vi) filing all necessary legal documents to obtain court approval of the transaction. *Id.* at ¶16. In public employment listings, Defendant freely refers to its job openings as "***sales***" positions for its "***sales force***" that consist of "***marketing campaigns***", "***high call volume***", and "***advertis[ing] nationwide via a variety of channels***".  *Id.* at ¶19.

5

Defendant has enjoyed great success, advertising on its website that it has funded over $75,000,000 in acquisitions of structured settlements. *Id.* at ¶ 17.   Driven by this financial incentive, Defendant engages in aggressive telemarketing tactics. *Id.* at ¶ 18. Defendant tracks down recipients of structured settlements from court and public records, and then incessantly calls and sends mail to their homes. *Id.* at ¶ 18. Numerous consumers have voiced their complaints regarding Defendant's aggressive solicitation practices. The following are just a few of the consumer complaints found on the Internet regarding Defendant's aggressive marketing strategies:

- This place constantly sends me mail. I have received calls, and one time even a text??? I was so furious I replied and demanded they stop contacting me and I blocked the number. Extremely unprofessional, I never once contacted them with any interest whatsoever so they obtained my home address and phone number and use it as they please. I'm sure they call my home phone as well but we don't even use that anymore because the only people calling that number are the persistent annoying scamming companies. I ask again... stop sending me mail, stop calling, and never have an employee text me again because its weird, unprofessional and very annoying. They don't even put their company name on the mail, just an address lol. Stop wasting your time because one glance at 2626 Foothill blvd I immediately trash it.

- As if telling them to remove me from their files wasn't enough, I now have people coming TO MY HOUSE. These people doing nothing more than try to harass people into business. Like you really think being this invasive is going to gain business with people?? "Only trying to help" really? You think that's helping. If I wanted to reach out to you, I would. THIS IS THE WORST COMPANY.

- These people will not stop calling me every week! When I told this woman they call me every other day or so, she rudely replies with "last time we called was last week. I'm checking our call log" as if having that type of attitude is going to make me want to do business with you...After I've explained to them over and over (nicely) that I'm not interested, they still call. Lisa just called me again and after telling her that I want my number removed because IM NOT INTERESTED, she tells me "your number is on public records" so what?? If I'm telling you to stop calling and harassing me, get the fucking point and have an oz of consideration and leave me the hell alone already. Jesus Christ, you guys are too desperate and need to stop harassing people for their business.

- These guys won't stop harassing me. I get calls from them weekly from multiple numbers and misleading letters in the mail. These guys are a bunch of scum bags.

- This place has been contacting my family for over two years, terrorizing us, sending us deceitful direct mail, and calling us from dozens of different phone numbers. We

have asked each and every time for them to stop contacting us; no matter what we say or do they continue to bully us. It has been exhausting and frustrating--every single time we get a call from a number we don't recognize we feel fearful. If you are a prospective customer: avoid this place at ALL COSTS. If you work at this company and are reading this: please, please, PLEASE, I BEG YOU, do the right thing and stop soliciting innocent people who are trying to go about their lives with as little trouble as possible.[9]

- harrassment via mail and phone I have repeatedly requested removal from unsolicited their call list and mail. I receive several forms of misleading mail each week that cannot be returned. They harass me via home and cell phone too. I've moved three times and even got a P.O box to stop the harassment and it still continues. Each time I speak with someone they tell me they will remove me from their lists, yet the harassment continues. They press me to divulge personal information that is none of their business and when family members answer they have shared personal information to them. Make them stop, please! They have not only harassed me, but family members too, as well as violated my privacy

- For over a year I have been getting calls from this company sometimes multiple times a day I ask over and over to be removed Company and it's agents refuses to honor my request to be removed from all of their calling list . When I ask to be removed they get upset hang up and next day again different agent calls They refuse to honor my request I am not interested in their service but they still call me all day everyday

- I have told business to STOP contacting me. They sent me fake gift cards around my birthday trying to get me to call them, keep texting and mailing me This company refuses to stop contacting me even though I have told them and my mom has told them several times and at length. For my birthday last year, they sent me gift cards which I thought was a gift from a friend trying to surprise me only for me to call them. They want me to sell my annuity which I will not do. Ever. I've told them and they still keep texting me and writing to me. I received a yesterday, August 22, at 5:29 Pm from someone named ****** asking me if I want access to my annuity which was court ordered. I blocked the number and deleted the conversation but I did take a screen shot. Today my mom received a letter from them trying to get me to sell. I want them to stop these aggressive tactics and stop using different numbers to contact me.

*Id.* at ¶ 18

Plaintiff was the target of one of Defendant's telemarketing campaigns.  Specifically, on

or about February 6, 2021 at approximately 9:33 a.m., Defendant called Plaintiff's cellular

---

[9] www.yelp.com/biz/catalina-structured-funding-la-crescenta-2

telephone number ending in 4021 ("4021 Number") from the telephone number 443-842-4319. *Id.* at ¶ 20. At no point in time did Plaintiff provide Defendant with her consent to be contacted by Defendant on the 4021 Number. *Id.* at ¶ 28. Plaintiff answered the phone call and asked that Defendant stop calling her. *Id.* at ¶ 21. Despite this request, Defendant called Plaintiff again February 6, 2021 and February 8, 2021. *Id.* at ¶ 22-25. Each time, Plaintiff asked Defendant to stop calling her. *Id.* at ¶ 23; 25.

Defendant's calls promoted Defendant's structured settlement products and related services. *Id.* at ¶ 27.

> Specifically, Defendant was attempting to solicit business from Plaintiff for the purpose of promoting and encouraging Plaintiff to invest time and money in Defendant's structured settlement products and related services for which Defendant would have charged Plaintiff various fees in the form of an effective discounted rate, including, but not limited to, fees related to (i) processing the Plaintiff's application; (ii) computing the present value of the structured settlement; (iii) complying with underwriting requirements; (iv) preparing and processing the contract; (v) complying with applicable disclosure laws and other laws pertaining to court approval; and (vi) filing all necessary legal documents to obtain court approval of the transaction.

*Id.*

### III.   ARGUMENT AND MEMORANDUM OF LAW

### A. That Defendant is a "Transferee" Under Michigan and Other State SSPAs is Irrelevant and, at Best, Defendant has Raised a Factual Dispute.

Preliminarily, Defendant's emphasis on the fact that it is considered a "transferee" under Michigan's and other state SSPAs is a red herring.  For one, Michigan's SSPA allows companies like Defendant to charge various fees related to the acquisition of a structured settlement, "including, but not limited to, court filing fees, attorney fees, escrow fees, lien recordation fees, judgment and lien search fees, finders' fees, commissions, and other payments to a broker or other intermediary."  MCL § 691.1302(t).  Defendant's filing of close to 300 pages of court documents in an effort to establish that it does not charge consumers fees is nothing more than a factual dispute

8

not appropriate on a motion to dismiss.  To the extent the Court is not satisfied with Plaintiff's allegations (which must be accepted as true) Plaintiff has demonstrated – through court filings from jurisdiction where Defendant is required to disclose its charges to consumers – that, consistent with Plaintiff's allegations, Defendant does not provide a free service or product. Defendant charges consumers for the services and loan products it provides in the form of discounted rates or interest rates.  From a common sense standpoint, consumers pay for Defendant's services and loan products; otherwise, Defendant would not be in business.

If there is any remaining question, this Court should rule on the issue on a complete factual record as one district court recently held when faced with similar arguments advanced by a defendant in a TCPA class action.  *See Less v. Quest Diagnostics, Inc*., No. 3:20 CV 2546, 2021 U.S. Dist. LEXIS 14320, at *4 (N.D. Ohio Jan. 26, 2021) ("More information is needed to determine whether the calls in this case were solicitations under the statute. Questions remain, such as -- What was the business strategy behind [Defendant] making the calls? How did the calls generate revenue for [Defendant]? Were the call operators paid on a commission or incentivized if recipients booked an appointment?").  Indeed, "at this stage of proceedings, Plaintiff need not entirely untangle [Defendant's]" marketing and business model "to survive dismissal." *Bouton v. Ocean Props.*, 223 F. Supp. 3d 1248, 1256 (S.D. Fla. 2016) (citing *Overton v. Wells Fargo Bank, N.A.*, 2012 U.S. Dist. LEXIS 15364, 2012 WL 401065, at *2 (E.D. Mo. Feb. 3, 2012) ("Courts should not dismiss complaints because plaintiffs are unable to plead facts 'which tend systemically to be in the sole possession of defendants.'") (quoting *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 598 (8th Cir. 2009)); *see also Lipscomb v. Cronic*, 2011 U.S. Dist. LEXIS 147190, 2011 WL 6755198, at *11 (N.D. Ga. Dec. 22, 2011).

**B.  Defendant was Engaged in Telephone Solicitations in Violation of the TCPA**.

Defendant correctly observes that "liability in this case hinges on whether Catalina's purpose in making the alleged calls was to encourage Plaintiff to purchase, rent, or invest in property, goods, or services." Mot. at 16.  Plaintiff, however, disagrees with Defendant's myopic interpretation of what constitutes a "telephone solicitation" under the TCPA.  Contrary to Defendant's position, there is no blanket rule that calls purporting to offer free services or attempting to purchase something are not telephone solicitations.  Accordingly, "[c]ourts may look beyond the pretextual claim that a service is 'free' when determining whether it is a solicitation under the TCPA." *Less*, 2021 U.S. Dist. LEXIS 14320, at *4 ("citing *Matthew N. Fulton, D.D.S., P.C. v. Enclarity, Inc.*, 962 F.3d 882, 890 (6th Cir. 2020) ("The TCPA covers faxes that serve as pretext for a commercial solicitation. In addition, and as previously described, the FCC has explained that offers for free goods or services fall within the TCPA because they are often part of an overall marketing campaign to sell property, goods, or services.") (citations and quotations marks omitted)); *see also In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, 18 FCC Rcd. 14014, 14097-98 (2003) ("Offers for free goods or services that are part of an overall marketing campaign to sell property, goods, or services constitute [an advertisement].").

In *Buja*, the District Court for the Southern District of Florida rejected an almost identical argument in a similar TCPA class action dealing with the purchase of structured settlements. 2017 U.S. Dist. LEXIS 231500.  In that case, the defendants, like Defendant here, "[e]mphasizing the word 'purchasing,' [] argue[d] that they are purchasers of structured settlements, not sellers of any goods or services." *Id*. at *19.  In rejecting this argument, the court in *Buja* preliminary noted that "Defendants' argument ignores the many services they provide as part of the structured-settlement

transfer transaction." *Id*. at *20.  The court went on to explain that,

> As part of the transaction, a structured-settlement company, such as Defendants,
> may perform a number of services to effectuate the transaction (for a fee charged
> to the payee ), including the following: (i) process the payee's application; (ii)
> compute the prevent value of the structured settlement; (iii) comply with
> underwriting requirements; (iv) prepare and process the contract; and (v) comply
> with applicable disclosure laws and other laws pertaining to court approval. (*See
> e.g.*, DE 45-2, Defendants' Sales Manual, at 10 (present value); 17, 68 (contract
> processing); 20, 68 (application and underwriting processing); 21-22, 68 (court
> approval).)[.]

*Id.* at *20-21. Ultimately, the court in *Buja* concluded that the calls at issue – calls like the ones in

this case seeking to "purchase" structured settlements – were telephone solicitations because the

"Defendants initiated telephone calls to Plaintiff 'for purpose of encouraging the purchase of . . .

services' provided by Defendants, as set forth in 47 C.F.R. § 64.1200(f)(11), (12)[.]" *Id*. at *21.

Here, Plaintiff alleges that Defendant was engaged in telephone solicitations because the

ultimate purpose of its calls was to encourage Plaintiff and the Class members to invest money

and time in Defendant's structured-settlement acquisition services and products.  Specifically,

Plaintiff alleges that Defendant provides consumers a number of services, including: (i) processing

the payee's application; (ii) computing the present value of the structured settlement; (iii)

complying with underwriting requirements; (iv) preparing and processing the contract; (v)

complying with applicable disclosure laws and other laws pertaining to court approval; and (vi)

filing all necessary legal documents to obtain court approval of the transaction.  FAC at ¶ 16.

Defendant charges fees to consumers for these services which are reflected as discounted rates on

the lump sums received by consumers and/or interest rate charges in jurisdictions where Defendant

is statutorily required to disclose to consumers what they are paying for Defendant's services.  *Id.*

at ¶ 15; *see also* RJN, *supra*, (disclosing interest rate charges as high as 30.70%).  Notably, before

the filing of this lawsuit, Defendant did not dispute that it was engaged in telemarketing, publicly

referring to its job openings as "*sales*" positions for its "*sales force*" that consist of "*marketing campaigns*", "*high call volume*", and "*advertis[ing] nationwide via a variety of channels*".  FAC at ¶ 19.

The authorities cited by Defendant cut against its position.  For example, in the FCC Order cited by Defendant, Mot. at 17, the FCC stated: "we clarify that a telephone solicitation would include calls by real estate agents to property owners for the purpose of offering their services to the owner, whether the property listing has lapsed or not."  *In the Matter of Rules & Reguls. Implementing the Tel. Consumer Prot. Act of 1991*, 20 F.C.C. Rcd. 3788, 3793-94 ¶ 15 (2005).  A real estate agent seeking to represent a seller in the sale of their home does not sell anything to the homeowner.  Instead, like Defendant's business model, real estate agent charge fees for their services that are reflected as discounted amounts on what the seller ultimately receives when they sell their home.

Similarly, *Orea v. Nielsen Audio, Inc.* involved a market survey where the plaintiff – unlike Plaintiff here – would not have had to ultimately pay for any service.  No. 14-cv-04235-JCS, 2015 U.S. Dist. LEXIS 54916, at *7 (N.D. Cal. Apr. 24, 2015).  The other authorities cited by Defendant all involve instances where the plaintiff would not have ultimately been required to purchase or pay for anything, either directly or indirectly.  *See, e.g., Friedman v. Torchmark Corporation*, No. 12-CV-2837-IEG BGS, 2013 U.S. Dist. LEXIS 114321, 2013 WL 4102201, at *6 (S.D. Cal. Aug. 13, 2013) (invitation to attend a recruiting webinar); *Murphy v. DCI Biologicals Orlando, LLC,* No. 6:12-CV-1459-ORL, 2013 U.S. Dist. LEXIS 181732, 2013 WL 6865772, at *10 (M.D. Fla. Dec. 31, 2013) (asking plaintiff to donate blood in exchange for cash); *Edelsberg v. Vroom, Inc.*, No. 16-cv-62734, 2018 U.S. Dist. LEXIS 50420 (S.D. Fla. Mar. 27, 2018) (offer to buy vehicle listed on Craigslist).

These cases offer nothing to the analysis before the Court. Unlike Defendant's cited authorities, Plaintiff alleges (and has demonstrated through Defendant's own court filings) that Defendant charges consumers fees for its services and loan products. Thus, the ultimate purpose of Defendant's calls was to solicit and encourage Plaintiff and the Class members to invest time and money in Defendant's services. At best, as discussed below, Defendant's calls constitute so-called "dual purpose" calls – calls that appear as non-solicitations on their face, but are ultimately devised to market products and services to consumers.

**C. Even if not Considered Direct Telephone Solicitations, Defendant's Calls are Violative Dual Purpose Calls.**

In 2003, the FCC issued guidance concerning dual purpose calls stating:

> The so-called "dual purpose" calls described in the record—calls from mortgage brokers to their clients notifying them of lower interest rates, calls from phone companies to customers regarding new calling plans, or calls from credit card companies offering overdraft protection to existing customers—would, in most instances, constitute "unsolicited advertisements," regardless of the customer service element to the call. The Commission explained in the 2002 Notice that such messages may inquire about a customer's satisfaction with a product already purchased, **but are motivated in part by the desire to ultimately sell additional goods or services. If the call is intended to offer property, goods, or services for sale either during the call, or in the future (such as in response to a message that provides a toll-free number), that call is an advertisement**.

*In re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, Report and Order, 18 FCC Rcd. 14014, 14098 ¶ 142 (July 3, 2003) (emphasis added).

Subsequently, in 2012, the FCC clarified – in the context of consumer opt-out requests – that,

> texts that encourage consumers to call or otherwise contact the sender in an attempt to market, including such texts that, while neutral on their face, lead to a marketing message if the consumer contacts the sender, are likely beyond the scope of the consumer's prior consent.

*In re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, Report and Order, 27 FCC Rcd. 15391, at ¶ 12 (Nov. 29, 2012).

Consistent with this guidance, the Ninth Circuit held that, "the FCC has determined that so-called 'dual purpose' calls, those with both a customer service or informational component as well as a marketing component, are prohibited." *Chesbro v. Best Buy Stores, LP*, 705 F.3d 913, 917 (9th Cir. 2012) (citing *2003 Report and Order* at 14097-98 ¶¶ 140-142). Further, the Ninth Circuit explained that in applying the dual purpose rule, courts must focus "not on the caller's characterization of the call, but on the purpose of the message." *Id.* at 918. It elaborated that courts should approach the analysis "with a measure of common sense," keeping in mind that "[n]either the statute nor the regulations require an explicit mention of a good, product, or service where the implication is clear from the context," and that "[a]ny additional information provided in the calls does not inoculate them." *Id.* The logic behind examining intent is sound: if the analysis relied solely on the face of the communication, companies could easily circumvent the TCPA's rules by using "informational" calls or ones purporting to offer a "free" service as a hook to then solicit business. This would effectively eviscerate the TCPA's express written consent requirement.

Courts evaluating calls that contain a marketing component have found them to be dual purpose calls for which express written consent is required. For example, in *Chesbro*, the defendant called the plaintiff with a prerecorded message to inform him that his "Best Buy Reward Zone" certificates were about to expire. 705 F.3d at 916. Subsequently, the defendant sent a second prerecorded messages to the plaintiff to notify him of changes to the rewards program and to encourage the plaintiff to "go to MyRewardZone.com for details and to update your membership." *Id.* at 916-17. In rejecting the defendant's argument that the calls were not telemarketing, the Ninth Circuit held:

The robot-calls urged the listener to "redeem" his Reward Zone points, directed him to a website where he could further engage with the RZP, and thanked him for "shopping at Best Buy." Redeeming Reward Zone points required going to a Best Buy store and making further purchases of Best Buy's goods. There was no other use for the Reward Zone points. Thus, the calls encouraged the listener to make future purchases at Best Buy.

*Id*. at 918.

In *Chinitz v. NRT West, Inc*, the defendants used prerecorded messages that simply stated that there "was a bad connection and someone would call [the recipient] back." No. 18-cv-06100-NC, 2019 U.S. Dist. LEXIS 27134, at *6 (N.D. Cal. Feb. 20, 2019). Thereafter, defendant's employee would follow up and attempt to sell their real estate brokerage services. *Id*. Defendant argued that the court should limit its dual-purpose analysis to just the content of the pre-recorded call itself. *Id* at *6-7. The court rejected this argument and stated that "[47 C.F.R. § 64.1200(a)(2)] makes clear that the TCPA reaches prerecorded messages that do not constitute advertisements or telemarketing themselves." *Id.* Thus, the initial pre-recorded call "'introduce[d]' the telemarketing call and is prohibited under the TCPA." *Id.* at *7.

Similarly, in *Golan v. Veritas Entm't, LLC*, the defendants engaged in a national telemarketing campaign to promote their movie, *Last Ounce of Courage*. 788 F.3d 814, 817 (8th Cir. 2015). They prepared two pre-recorded messages, one that was played if the recipient answered his/her phone, and another which was left as a voicemail if the phone was not answered. *Id*. The plaintiffs did not answer their phones and consequently received the following pre-recorded message on their voicemail: "Liberty. This is a public survey call. We may call back later." *Id*. at 816. In granting the defendant's motion to dismiss, the district court concluded that the messages received by the plaintiffs did not contain an advertisement and did not constitute telemarketing. *Id*. at 818. On appeal, the Eighth Circuit reversed, rejecting the defendants' argument that it should "consider only the content of the calls in determining whether they were

'telemarketing.'"   *Id*. at 820 (citing *Alleman v. Yellowbook, Inc.*, No. 12-CV-1300-DRH-PMF, 2013 U.S. Dist. LEXIS 127212 (S.D. Ill. Sept. 6, 2013)).

The Eighth Circuit reasoned that "[n]either the TCPA nor its implementing regulations 'require an explicit mention of a good, product, or service' where the implication of an improper purpose is 'clear from the context.'"   *Id*. (citing *Chesbro*, 705 F.3d at 918).   The Eighth Circuit further held:

> Here, the context of the calls indicates that they were initiated for the purpose of promoting Last Ounce of Courage….Although the campaign appeared to survey whether recipients had "traditional American values," [the producers of the movie] were "more concerned with getting viewers to see Last Ounce of Courage than gathering information about them."…. Since the calls were initiated and transmitted to the Golans in order to promote Last Ounce of Courage, they qualified as "telemarketing" even though the messages never referenced the film.

*Golan*, 788 F.3d at 820.

In *Flores v. Access Ins. Co.*, the defendant, an auto insurance company, sent the following text message to the plaintiff's cellular telephone: "Your Access Auto Insurance policy cancels 01/26/2015. To avoid cancellation, make a payment at [this website]. Reply STOP to Opt-out." No. 2:15-cv-02883-CAS(AGRx), 2017 U.S. Dist. LEXIS 36486, at *2 (C.D. Cal. Mar. 13, 2017). The plaintiff alleged that the defendant violated the TCPA by sending him a text message without his express written consent.  *Id*. at *20.   The defendant argued that it did not need written consent because its text message did not constitute telemarketing.   *Id*.   In rejecting the defendant's argument, the court sided with the plaintiff's contention

> that defendant's communications had two purposes: (1) to alert plaintiff to the expiration of his auto insurance policy; and (2) to encourage plaintiff to renew his policy. That is, the communications had both informational and telemarketing purposes because plaintiff was informed about the status of his policy and was encouraged to purchase services from defendant.

*Id*. at \*21 (internal citation omitted). Since the defendant failed to obtain express written consent, the court concluded that the plaintiff had adequately stated a claim for violation of the TCPA.

In *Meyer v. Bebe Stores, Inc.*, the defendant sent the following text message to the plaintiff: "bebe: 'Get on the list! Reply YES to confirm opt-in. 10% OFF reg-price in-store/online. Restrictions apply. 2msg/mo, w/latest offers. Msg & data rates may apply.'" No. 14-cv-00267-YGR, 2015 U.S. Dist. LEXIS 12060, at \*3 (N.D. Cal. Feb. 2, 2015). The plaintiff alleged that the defendant violated the TCPA because it did not have her express written consent to send her text messages. *Id*. The defendant countered that its message was "merely an informational or administrative message," for which it only needed express consent. *Id*. at \*11. The court agreed with the plaintiff, holding that the text message at issue was an impermissible dual purpose message that sought to encourage a future purchase. *Id*. The court was not persuaded by the fact that the message served a dual administrative function (opt-in), holding that express written consent was required because of the marketing component of the message (encouraging future purchases). *Id*. at \*12.

Lastly, in *Toney v. Quality Res., Inc.*, the plaintiff provided her cellular telephone number to the defendant in connection with the purchase of children's shoes. 75 F. Supp. 3d 727, 731-32 (N.D. Ill. 2014). Subsequently, the defendant called the plaintiff's cellular telephone with an automated dialer to verify the plaintiff's address. *Id*. at 732. During that call, the defendant's agent tried to sell the plaintiff a membership in defendant's "Budget Savers" program. *Id*. The plaintiff filed suit under the TCPA, claiming that the defendant contacted her without her express written consent. *Id*. at 731. The defendant disputed plaintiff's characterization of the call, claiming that it was simply a "confirmation telephone call." *Id*. at 737. The court ultimately agreed with the plaintiff, holding that the call was a dual purpose call that it deemed a "sales call," because

defendant, in addition to verifying plaintiff's information, attempted to sell her the "Budget Savers" program.  *Id*. at 738.

Here, Defendant's calls are at best dual purpose solicitations that are actionable under the TCPA.  Defendant contacted Plaintiff and the Class members with purported offers to "purchase" their structured settlements.  While Defendant attempts to characterize its calls as innocent offers to purchase something, they were in reality solicitations intended to sell Defendant's loan products and related services.  Ultimately, to the extent this Court has any remaining questions, it should address them on a complete factual record as did the court in *Less*.  *See* 2021 U.S. Dist. LEXIS 14320, at *4 (N.D. Ohio Jan. 26, 2021) ("More information is needed to determine whether the calls in this case were solicitations under the statute. Questions remain, such as -- What was the business strategy behind [Defendant] making the calls? How did the calls generate revenue for [Defendant]? Were the call operators paid on a commission or incentivized if recipients booked an appointment?").

IV.  **CONCLUSION**

Defendant is not a charity or not-for-profit organization.  Defendant is a business which scours court records for structured settlement recipients and then aggressively markets to them, even after requests for the calls to stop. Defendant's services are not free. Defendant was engaged in soliciting Plaintiff and the Class members and should be held accountable for its TCPA violations.

**WHEREFORE**, Plaintiff Beverly Anderson respectfully requests an Order denying Defendant's Motion, and for such other relief deemed appropriate under the circumstances.

Dated: July 6, 2021

Respectfully submitted,

*Manuel S. Hiraldo*
Manuel S. Hiraldo, Esq.
**HIRALDO P.A.**
401 E. Las Olas Blvd., Ste. 1400
Fort Lauderdale, FL 33301
mhiraldo@hiraldolaw.com
954-400-4713

Ignacio Hiraldo, Esq.
**IJH LAW**
1200 Brickell Ave. Suite 1950
Miami, FL 33131
E: IJhiraldo@IJhlaw.com
T: 786-496-4469

*Attorneys for Plaintiff*

## **CERTIFICATE OF COMPLIANCE**

This brief complies with the word limit of Local Civil Rule 7.2(b)(i). The total word count of this response brief is **5,991**. The total word count was generated by Microsoft Word and does not include the case caption, cover sheets, any table of contents, any table of authorities, the signature block, attachments, exhibits, and affidavits.

By: */s/ Manuel S. Hiraldo*
Manuel S. Hiraldo, Esq.