UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

BEVERLY ANDERSON,
Individually and on behalf of all
others similarly situated,

            Plaintiff,                            Hon. Paul L. Maloney

v.                                         Case No. 1:21-cv-197

CATALINA STRUCTURED
FUNDING, INC.,

            Defendant.
_____/

## REPORT AND RECOMMENDATION

Plaintiff Beverly Anderson has filed a putative class action complaint against Defendant Catalina Structured Funding, Inc., alleging that Catalina violated the Telephone Consumer Protection Act (TCPA), 47 U.S.C. § 227. In particular, she contends that Catalina violated Section 227(c) and its implementing regulation, 47 C.F.R. § 64.1200, when it made three calls to her cellular telephone number, which she had registered on the national do-not-call registry. Anderson seeks to represent two proposed classes, an Internal Do Not Call Class and a Do Not Call Class. Catalina's reason for calling Anderson is determinative of whether her claims may proceed, and thus, whether she may represent the putative classes.

Presently before me is Catalina's Motion to Dismiss First Amended Class Action Complaint. (ECF No. 14.) The motion is fully briefed and ready for decision. The essential issue is whether Catalina's call was a telephone solicitation as it has been defined under the TCPA. More specifically, the question is whether Catalina called Anderson to encourage *her to purchase, rent, or invest* in *Catalina's* property, goods, or services. If so, her claims may proceed. If Catalina's

call does not fall under the statute, Anderson does not have a cause of action. Catalina says the call was nothing more than an offer to purchase Anderson's property. Anderson says the call was an offer to sell the service of converting Anderson's structured settlement into a lump sum payment. Although it is an interesting question and an issue of first impression in this Circuit, pursuant to 28 U.S.C. § 636(b)(1)(B), I recommend that the Court **DENY** the motion.[1]

## I.      Background

Catalina is in the business of purchasing structured settlements and annuities from individuals. (ECF No. 12 at PageID.195.) A structured settlement "generally refers to a tort settlement [that] requires a defendant to make a sequence of payments over time." *Langkamp v United States*, 943 F.3d 1346, 1351 (Fed. Cir. 2019) (citing, among others, Guy Kornblum & Matthew Garretson, 1 Negotiating and Settling Tort Cases § 18:1 (2009) ("By definition, a structured settlement describes compensation for a personal injury claim in which at least part of the settlement is paid over time, rather than with one lump sum. In lieu of receiving all monies up front, the claimant receives instead a promise from an entity to make future payments according to an agreed-upon schedule.")); *see also* Black's Law Dictionary (11th ed. 2019) (defining "structured settlement" as "[a] settlement in which the defendant agrees to pay periodic sums to the plaintiff for a specified time"). Often, the income stream is funded through the purchase of an annuity. *Langkamp*, 943 F.3d at 1352. (ECF No. 12 at PageID.195 ("A structured settlement is a legal settlement which provides in whole or in part for periodic payments. Pursuant to the structured settlement, the annuitant must receive their money in payments over time.").)

To provide some degree of protection to tort plaintiffs who have entered into structured settlements, most states have enacted statutes governing structured settlement purchases by

---

[1] Although Anderson has requested oral argument, the parties' briefs adequately address the issues, and oral argument would not further inform the decisional process.

companies like Catalina that provide liquidity as an option to receiving a stream of future payments. *See Symetra Life Ins. Co. v. Rapid Settlements Ltd.*, No. H-05-3167, 2006 WL 2382250, at *1 (S.D. Tex. Aug. 16, 2006) (noting that Texas transfer statute was designed "to protect the claimant/payee from overreaching by funding companies and to ensure that the decision to give up future payment streams in exchange for a present benefit is an informed decision").

In Michigan, structured settlement transfers are governed by the Revised Structured Settlement Protection Act (RSSPA), Mich. Comp. Laws § 691.1301 *et seq.* Under the RSSPA, a "transfer" includes "a sale, assignment, pledge, hypothecation, or other alienation or encumbrance of structured settlement payment rights a payee makes for consideration." Mich. Comp. Laws § 691.1302(r). A "payee" is "an individual who receives tax free payments under a structured settlement and who proposes to make a transfer of payment rights under the structured settlement." Mich. Comp. Laws. § 691.1302(i). A "transferee" is "a person acquiring or proposing to acquire structured settlement payment rights through a transfer." Mich. Comp. Laws § 691.1302(u). A valid transfer of structured settlement payment rights requires court approval memorialized in an order setting forth certain findings, including that: (1) the transfer is in the best interest of the payee; (2) the transferee has advised the payee to seek independent advice, and the payee has either received such advice or waived in writing the opportunity to seek such advice; and (3) the discount rate used to determine the present value of the structured settlement payments to be transferred does not exceed 25 percent per year. Mich. Comp. Laws §§ 691.1304(a), (b), and (d), 1306. In addition, at least three days prior to the time a payee signs a transfer agreement, the transferee must "provide to the payee a separate disclosure statement . . . setting forth [among other things] . . . "[a]n itemized listing of all applicable transfer expenses, other than attorney fees and related disbursements payable in connection with the transferee's application for approval of the transfer,

and the transferee's best estimate of the amount of the fees and disbursements." Mich. Comp. Laws. § 691.1303(e). The transferee must provide the disclosure statement and other required documents to the court at least 20 days before the scheduled hearing. Mich. Comp. Laws § 691.1306(2)(c).

Anderson alleges that between February 6, 2021, and February 8, 2021, Catalina's representatives called her cellular telephone number ending in 4021 three times. (ECF No. 12 at PageID.199–200.) Other than alleging that each time she told the caller to stop calling her, Anderson provides no details about the content of the calls. She asserts, however, that "[t]he purpose of the call was to market and advertise [Catalina's] goods and/or products or services regarding annuities and structured settlements." (*Id.* at PageID.199.) Anderson also alleges that her number had been registered on the national do-not-call (DNC) registry since November of 2007. (*Id.* at PageID.201.)

## II.  Motion Standard

A Rule 12(b)(6) motion to dismiss for failure to state a claim on which relief may be granted tests the legal sufficiency of a complaint by evaluating its assertions in a light most favorable to Plaintiff to determine whether it states a valid claim for relief. *See In re NM Holdings Co., LLC*, 622 F.3d 613, 618 (6th Cir. 2010). Pursuant to Federal Rule of Civil Procedure 12(b)(6), a claim must be dismissed for failure to state a claim on which relief may be granted unless the "[f]actual allegations [are] enough to raise a right to relief above the speculative level on the assumption that all of the complaint's allegations are true." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 545 (2007). As the Supreme Court has held, to survive a motion to dismiss, a complaint must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 677-78 (2009). This plausibility standard "is not akin

4

to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* If the complaint simply pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.'" *Id.* As the Court further observed, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* at 678-79.

## III.  Discussion

Anderson alleges two claims asserting that Catalina engaged in improper telemarketing or telephone solicitation under the TCPA. Pursuant to Section 227(c)(1) and (2) of the TCPA, the Federal Communications Commission (FCC) adopted 47 C.F.R. § 64.1200 to protect residential telephone subscribers from receiving unwanted telephone solicitations. Section 64.1200(d) prohibits a telemarketer from "initiat[ing] any call for telemarketing purposes to a residential telephone subscriber unless such person or entity has instituted procedures for maintaining a list of persons who request not to receive telemarketing calls made by or on behalf of that person or entity." In Count I, Anderson alleges that Catalina's failure to honor her requests to cease calling her is indicative of Catalina's failure to implement and maintain an internal do-not-call list and to train its personnel in the use of such list. (ECF No. 12 at PageID.204–05.) Section 64.1200(c)(2) prohibits "any telephone solicitation to . . . [a] residential telephone subscriber who has registered his or her telephone number on the national [DNC] registry of persons who do not wish to receive telephone solicitations." Anderson alleges in Count II that Catalina violated this provision by initiating, or causing to be initiated, a telephone solicitation to her cellular number that she had registered on the DNC registry. (*Id.* at PageID.206–07.) Section 227(5) of the TCPA provides a private right of action to "[a] person who has received more than one telephone call within any 12-month period by or on behalf of the same entity in violation of [47 C.F.R. § 64.1200]."

The TCPA defines the term "telephone solicitation," in part, as "the initiation of a telephone call or message for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services, which is transmitted to any person . . ." 47 U.S.C. § 227(a)(4). The regulation parrots this definition for "telephone solicitation," 47 C.F.R. § 64.1200(f)(15), and defines "telemarketing" in essentially the same manner. 47 C.F.R. § 64.1200(f)(13) ("The term telemarketing means the initiation of a telephone call or message *for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services*, which is transmitted to any person." (emphasis added)). As one court observed, the only sensible reading of these definitions is that the caller must encourage the recipient of the call to purchase, rent, or invest "in, [the caller's] property, goods, or services," as "[a]ny other reading would include absurd results by sweeping into a consumer protection statute prohibitions against a range of ordinary social interactions." *Orea v. Nielsen Audio, Inc.* No. 14-cv-04235, 2015 WL 1885936, at *2-3 (N.D. Cal. Apr. 24, 2015). In this regard, the FCC has distinguished calls constituting a telephone solicitation, for example, "calls by real estate agents to property owners for the purpose of offering their services to the owner," from calls that are not solicitations, for example, a real estate agent's call to an owner of a listed property to discuss a potential sale to the buyer the agent represents. *In the Matter of Rules and Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 20 FCC Rcd. 3788, 3793–94 ¶ 15 (2005).

In line with this interpretation, courts have held that a call does not constitute a telephone solicitation or telemarketing when the caller merely seeks something from the recipient and does not encourage the recipient to purchase, rent, or invest in the caller's property, goods, or services. In *Jance v. Homerun Offer LLC*, No. CV-20-482, 2021 WL 3270318 (D. Ariz. July 30, 2021), the court held that calls to the plaintiff's cell phone seeking to determine his interest in selling his

home, and not to induce a purchase by the plaintiff, were neither telemarketing nor solicitation. *Id.* at *1, 4. *See also Gross v. GG Homes, Inc.*, No. 3:21-cv-00271, 2021 WL 2863623, at *1, 8 (S.D. Cal. July 8, 2021), *reconsideration granted on other grounds*, 2021 WL 4804464 (S.D. Cal. Oct. 14, 2021) (text messages to the plaintiff's cell phone seeking information about "off market" real estate deals sought services from the plaintiff and therefore were not telephone solicitations under the TCPA); *Knutson v. Blue Light Sec., Inc.*, 17cv134, 2018 WL 1172611, at *4 (S.D. Cal. Mar. 6, 2018) (the defendant's call to the real estate agent plaintiff seeking to buy information from the plaintiff about his clients, so that defendant could advertise security systems to his clients, was not telemarketing or advertising under the FCC's regulation); *Murphy v. DCI Biologicals Orlando, LLC*, No. 6:12-cv-1459, 2013 WL 6865772, at *10 (M.D. Fla. Dec. 31, 2013), *aff'd*, 797 F.3d 1302 (11th Cir. 2015) (messages asking the plaintiff to sell his blood to the defendant were not telephone solicitations because they did not encourage the plaintiff "to purchase, rent, or invest in anything").

Anderson's theory, as stated in her FACAC, is as follows:

> Defendant's calls constitute telemarketing/advertising because they promote Defendant's structured settlement products and related services. Specifically, Defendant was attempting to solicit business from Plaintiff for the purpose of promoting and encouraging Plaintiff to invest time and money in Defendant's structured settlement products and related services for which Defendant would have charged Plaintiff various fees in the form of an effective discounted rate, including, but not limited to, fees related to (i) processing the Plaintiff's application; (ii) computing the present value of the structured settlement; (iii) complying with underwriting requirements; (iv) preparing and processing the contract; (v) complying with applicable disclosure laws and other laws pertaining to court approval; and (vi) filing all necessary legal documents to obtain court approval of the transaction.

(ECF No. 12 at PageID.200.) Catalina's theory, by contrast, is that the transactions in which Catalina engages bear all of the hallmarks of an outright purchase of structured settlement payment

7

rights, rather than being a service.[2] Anderson admits that Catalina "purchases structured settlements and annuities from individuals," and "offers consumers the option to obtain their money in a lump-sum—at a discount—rather than over a period of time." (ECF No. 12 at PageID.195.) Notably, the above-cited provisions of the RSSPA confirm that Catalina, a "transferee" under the statute, acquires the payee's structured settlement payment rights for consideration, *i.e.*, a lump-sum payment discounted to present value.

In support of its motion, Catalina requests that the Court take judicial notice of certain Michigan state-court filings in connection with petitions to approve sales of structured settlement payment rights to Catalina. (ECF No. 16.) In light of the public nature of these documents, the Court may properly consider them in deciding Catalina's motion. *New England Health Care Emps. Pension Fund v. Ernst & Young, LLP*, 336 F.3d 495, 501 (6th Cir. 2003); *see also Knutson*, 2018 WL 1172611, at *1 (noting that court records can be "judicially noticed" and properly "considered when ruling on a 12(b)(6) motion to dismiss" (citing *Peviani v. Hostess Brands, Inc.*, 750 F. Supp. 2d 1111, 1116 (C.D. Cal. 2010), and *Swartz v. KPMG LLP*, 476 F.3d 756, 763 (9th Cir. 2007))). The court records, particularly the disclosure statements set forth in Exhibits 15–22 of Catalina's request, state that Catalina does not charge structured settlement payees fees as part of these transactions. Anderson does not contest this fact in her response, and the documents she requests that the Court judicially notice also confirm that Catalina does not charge the payee fees (separate from the discounted payment) in connection with its purchase of structured settlement payment rights. (ECF No. 22-2 at PageID.935, 999.) However, she counters that Catalina actually performs

---

[2]  *See* Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/purchase (last visited Oct. 12, 2021) (defining "purchase" as "something obtained especially for a price in money or its equivalent"); Black's Law Dictionary (11th ed. 2019) (defining "purchase" as "[t]he acquisition of an interest in real or personal property by sale, discount, negotiation, mortgage, pledge, lien, issue, reissue, gift, or any other voluntary transaction").

services for payees and charges them fees through discounted rates on the lump sum payments it makes. (ECF No. 22 at PageID.904.)

These transactions are not amenable to unambiguous characterization. Catalina may view it as a purchase, but it is certainly offering a service to the payee who would like his or her cash up front. Catalina's argument sounds a little like a real estate buyer's agent who tells his or her client that the home sellers will pay the fees associated with the buyer's agent's services, rather than the buyer. That is ridiculous, of course: the buyer could offer to pay less for the house if the seller did not have to pay the buyer's agent's fees. Here, too, just because the fees may be taken out of the lump sum payment to the payee rather than itemized does not mean that no fees were charged in connection with the transaction. But the real estate broker analogy is not perfect: Catalina is not a broker—it is the principal buying the property in the transaction. One might argue that the "services" Catalina performs—processing payment applications, computing the present value of the structured settlement, filing all necessary legal documents, and the like—are equally beneficial, if not more so, to Catalina, for without them, Catalina could not accomplish its business objective of purchasing structured settlements.

The existing case law does not much assist the Court. There is only one case that considers this issue in the structured settlement context. In *Buja v. Novation Capital, LLC*, No. 15-81002, 2017 WL 10398957 (S.D. Fla. Mar. 31, 2017), plaintiff moved for leave to file a second amended complaint seeking to add a claim that defendants failed to establish proper practices and procedures regarding do-not-call requests under 47 U.S.C. § 227(c). There, like here, defendants were buyers of structured settlements who identified recipients of structured settlements or annuities and then placed telephone calls to solicit them to sell. Buja alleged that he received 13 calls from defendants soliciting the sale of his structured settlement after telling them to place him on their DNC list.

There, like here, defendants argued that they were not telemarketers or sellers for purposes of the TCPA. In finding that defendants' calls to Buja were initiated "for the purpose of encouraging the purchase of services provided by Defendants," the court focused on the services structured settlement purchasers provided to payees:

> As part of the transaction, a structured-settlement company, such as Defendants, may perform a number of services to effectuate the transaction (for a fee charged to the payee), including the following: (i) process the payee's application; (ii) compute the [present] value of the structured settlement; (iii) comply with underwriting requirements; (iv) prepare and process the contract; and (v) comply with applicable disclosure laws and other laws pertaining to court approval.

*Buja*, 2017 WL 10398957, at *7 (internal quotation marks and footnotes omitted).

At least one court and the FCC have stated that a call recipient plaintiff who had put his or her property up for sale has not stated a claim under the TCPA. For example, the FCC has stated that "calls by real estate agents who represent only the potential buyer to someone who has advertised their property for sale, do not constitute telephone solicitations, so long as the purpose of the call is to discuss a potential sale of the property to the represented buyer" because the call is "in response to an offer to purchase something from the called party." *In the Matter of Rules and Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 20 FCC Rcd. 3788, 3793–94 ¶ 15 (2005). Likewise, in *Edelsberg v. Vroom, Inc.*, No. 16-cv-62734, 2018 WL 1509135 (S.D. Fla. Mar. 27, 2018), the court held that a text message from the defendant indicating an interest in purchasing the plaintiff's car (which the plaintiff had listed on Craigslist) and directing the plaintiff to an online appraisal form was not actionable as telemarketing under the TCPA. *Id.* at 4–5.

The analysis in *Buja* is somewhat difficult to square with the District of Arizona's decision in *Jance v. Homerun Offer LLC*, 2021 WL 3270318. There, the plaintiff claimed that defendants had made multiple calls to plaintiff's cell phone purporting to be on behalf of a local investor, inquiring if plaintiff had an interest in selling his property. The court dismissed the claim under

Section 227(c) because the TCPA's definitions of solicitation and telemarketing did not include an offer to purchase. *Id.* at *4. The *Jance* court's analysis is cursory, but one could certainly make the argument that selling a home is no different from selling a right to a structured settlement. But *Jance* does not further analyze the issue.

On the whole, I find *Buja's* analysis more persuasive. The argument that Defendant is simply trying to purchase structured settlements is not without merit—certainly Catalina's motivation is to make a profit from buying structured settlements at a discount. As noted above, the question of whether the payee pays the fees for services separately from an itemized list or as part of a reduced lump sum payment is irrelevant to the question of whether the payee pays fees as part of the transaction. *Cf. Less v. Quest Diagnostics Inc.*, 515 F. Supp. 3d 715, 717-18 (N.D. Ohio 2021) ("Courts may look beyond the pretextual claim that a service is "free" when determining whether it is a solicitation under the TCPA."). Here, though, where Plaintiff has expressed no interest in selling, and Defendant is in the business of offering liquidity to structured settlement holders, Defendant may be offering to make a purchase, but it is also marketing a service. To suggest it is not is too clever by half.

The Court is mindful that the Sixth Circuit has counseled against broadly construing remedial statutes. Writing for the panel in *Sandusky Wellness Center, LLC v. Medco Health Solutions, Inc.*, 788 F.3d 218 (6th Cir. 2015), a TCPA case involving unsolicited faxes, Judge McKeague explained why this rule makes no sense, at least when the language at issue is unambiguous:

> And no, we won't "broadly construe" the Act in Sandusky's favor because it is a so-called "remedial statute." As applied today, that canon is "either incomprehensible or superfluous." Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 364–66 (2012). Why interpret a statute's language broadly or narrowly (as opposed to just reasonably or fairly)? And since all statutes remedy what's seen as a problem, which statutes do not deserve a broad

11

> construction? *Id.* at 364. In any event, insofar as our case law requires the canon's
> application at all, it doesn't require it when the statute's language is plain, *In re*
> *Carter,* 553 F.3d 979, 985–86 (6th Cir. 2009), as it is here. "The broad remedial
> goals of the [ ] Act" (assuming there are such goals) "are insufficient justification
> for interpreting a specific provision more broadly than its language and the statutory
> scheme reasonably permit." *Pinter v. Dahl*, 486 U.S. 622, 653 (1988) (internal
> quotation marks omitted). The language and statutory scheme of this Act do not
> reasonably permit an interpretation that makes these faxes "advertisements." And
> so they're not.

*Id.* at 224 (record citations omitted). *Cf. Ammons v. Ally Fin., Inc.*, 326 F. Supp. 3d 578, 597 (M.D.

Tenn. 2018) ("But the TCPA is a remedial statute that should be construed broadly to benefit

consumers, and, thus, should be liberally construed and should be interpreted (when that is

possible) in a manner tending to discourage attempted evasions by wrongdoers." (internal citation

and quotation marks omitted)). Here, however, the interpretation of the nature of the transaction

depends on whether it is viewed through the lens of the payee or the caller. That Catalina's

intention is to purchase a structured settlement does not detract from the reality of the transaction

from Anderson's: that Catalina called Anderson to offer her the service of turning a long-term

income stream into immediate cash. Recognizing that a transaction may permit two different

interpretations does not expand the scope of the TCPA where one characterization falls squarely

within the statute.

Even if the Court were inclined to credit the notion that Catalina called Anderson merely

to make a purchase because it does not charge itemized fees, at least one court in an analogous

context has held that the plaintiff was entitled to discovery to determine the underlying nature of

the defendant's business, so that the court could rule on a complete factual record. *See Less*, 515

F. Supp. 3d at 717-18 ("More information is needed to determine whether the calls in this case

were solicitations under the statute. Questions remain, such as—What was the business strategy

behind Quest/MedXM making the calls? How did the calls generate revenue for Quest/MedXM?

Were the call operators paid on a commission or incentivized if recipients booked an appointment?"). Likewise, here, Plaintiff is entitled to discovery on the issue.

### III.   Conclusion

For the foregoing reasons, I recommend that the Court **deny** Catalina's motion to dismiss (ECF No. 14).

Dated: December 21, 2021                                       /s/ Sally J. Berens
                                                              SALLY J. BERENS
                                                              U.S. Magistrate Judge

### **NOTICE**

OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within 14 days of the date of service of this notice. 28 U.S.C. § 636(b)(1)(C). Failure to file objections within the specified time waives the right to appeal the District Court's order. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).